IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AHMED IBRAHIM,<br>　　　Plaintiff,<br><br>v.<br><br>THE UNIVERSITY OF CHICAGO,<br>　　　Defendant. | Case No. 17 C 6213<br><br>Judge Jorge L. Alonso |

## MEMORANDUM OPINION AND ORDER

Plaintiff Dr. Ahmed Ibrahim brought this employment discrimination action against The University of Chicago ("the University") on claims of religion, national origin, and sex discrimination. [Dkt 1.] Before the Court is the University's Motion for Summary Judgment. [Dkt 62.] For the following reasons, the motion is granted.

### BACKGROUND

Unless otherwise noted, the following facts are undisputed.[1] The University is a private, postsecondary institution of higher education whose primary missions are research and teaching. [Dkt 65, Pl.'s Resp. SOF ¶ 1.] It prohibits discrimination based on any characteristic protected by law, and instructs employees who believe they have been discriminated against or harassed to inform their supervisor, human resources, labor/employee relations, or the affirmative action officer. [*Id.* ¶ 2.]

---

[1] As discussed further below, several of Ibrahim's responses to the University's asserted facts are unsupported by citation to the record, or contain objections with no indication of whether the asserted fact is nevertheless disputed or agreed. (*See infra*.) This Court disregards responsive statements that are inadequately supported or otherwise do not comport with Northern District of Illinois Local Rule 56.1, and deems admitted all asserted facts that are properly supported by the record. *Frey Corp. v. City of Peoria, Ill.*, 735 F.3d 505, 513 (7th Cir. 2013).

1

Outlier Research and Evaluation ("Outlier"), is the outward facing brand of a research center called UChicago's STEM Education. [*Id.* ¶ 3.] Outlier conducts research on STEM (science, technology, engineering, and mathematics) education and other topics, conducts education program evaluations, and publicizes peer-reviewed papers and materials. [*Id.*] Work at Outlier is project-based, and performed by a team of staff with complementary skills. [*Id.* ¶ 5.] The work is collaborative, with team members contributing their expertise to a common purpose like securing funding through proposal submissions, conducting research, analyzing data, and publishing papers. [*Id.*]

In June 2016, the University hired Ibrahim as an Associate Research Scientist (previously titled "Lead Researcher") at Outlier. [*Id.* ¶¶ 10, 14.] Ibrahim holds a Ph.D. in educational psychology with a specialization in the learning sciences. [*Id.* ¶ 9.] Dr. Jeanne Century is the Director of Outlier, and the Research and Evaluation Director of UChicago STEM Education. [*Id.* ¶ 3.] Century made the decision to hire Ibrahim based on his expertise in advanced quantitative research and research design. [*Id.*] He was the only male, the only Muslim, and the only person of Egyptian national origin in the Outlier group. [*Id.* ¶ 8; dkt 69, Def.'s Resp. Pl's Add'l SOF ¶ 1.]

Ibrahim was scheduled to start with the University on July 1, 2016. [Pl.'s Resp. SOF ¶ 20.] In order to take the position, he and his family moved from California to Chicago. [Def.'s Resp. Pl's Add'l SOF ¶ 2.] On June 30, 2016, Outlier's human resources representative Meri Fohran emailed Ibrahim the details of where and when he should report to work the following day. [Pl.'s Resp. SOF ¶ 20.] Ibrahim responded by advising that because his flight to Chicago would not arrive until the next evening, he would not report to work until July 5, 2016. [*Id.*] Century testified that she believed this demonstrated poor judgment and communication and a lack of professionalism. [*Id.* ¶ 21.]

2

Ibrahim's employment at the University was at will, and probationary for the first six months. [*Id.* ¶ 12.] The University's Probationary Period Policy provides that: "The probationary period is a time for you to learn about your job and become familiar with the University of Chicago. During this time, your supervisor will explain your department's policies and procedure, your job duties, and your performance expectation. Your performance will be closely evaluated by your supervisor to ensure you understand and are able to meet the performance expectations." [*Id.* ¶ 12.] Nevertheless, the parties dispute what the designation of probationary meant in practice, and whether Ibrahim was supervised during his time with the University only by Century or also by Drs. Sarah Wille and Melanie LaForce. [*Id.* ¶ 7; Def.'s Resp. Pl's Add'l SOF ¶ 3.] According to Ibrahim, all three were his project directors and supervisors. [Pl.'s Resp. SOF ¶ 7, 16; dkt 66, Pl.'s Add'l SOF ¶ 3.] According to the University, a project director is different from a supervisor in that a project director assigns work and provides feedback, but only a supervisor has the official authority to conduct an employee's performance review. [Dkt 64, Def.'s SOF ¶ 7.] In any event, it is undisputed that Century was the only person at Outlier with the authority to hire and discipline employees, and Century treated the probationary period as an opportunity to observe new employees closely to determine whether or not they would be a good fit for the position. [Pl's Resp. SOF ¶¶ 7, 13.]

During Ibrahim's employment with the University, there were five levels of Outlier staff below Century, in descending order of seniority and responsibility: (1) Senior Researcher and Evaluation Scientist; (2) Associate Research Scientist; (3) Research and Evaluation Associate; (4) Lead Research Assistant; and (5) Research Assistant. [*Id.* ¶ 14.] Century's expectations for leadership, sophistication of work, and communication skills are greater for more senior employees. [*Id.* ¶ 14.]

3

Drs. Heather King and Courtney Blackwell were Associate Research Scientists like Ibrahim at the time of his employment, but neither were probationary employees. [*Id.* ¶ 17.] The role of an Associate Research Scientist at Outlier requires implementation of highly skilled quantitative and qualitative research methods, proposal development, writing for peer-reviewed publication, and mentoring and supporting the growth and development of other team members. [*Id.*] Century expects an Associate Research Scientist to be an expert in his or her area of specialty, to work independently, and to proactively problem-solve in his or her area of expertise. [*Id.*]

Liz Noble and Mary Beth Talbot were Research and Evaluation Associates during Ibrahim's employment with the University, and Stephanie Loo was a Lead Research Assistant. [*Id.* ¶ 18.] None were in their probationary period. [*Id.*]

According to the University, Ibrahim consistently failed to complete work in a timely fashion, causing others to take on his responsibilities, and work to be done at the last minute. [Def.'s SOF ¶ 23.] Ibrahim disputes this, and says that Outlier's typical approach was chaotic, disorganized, and rushed. [Pl.'s Resp. SOF ¶ 23.] For example, on or about July 19, 2016, Century told Ibrahim that his two highest priorities were contributing to the projects that Wille and LaForce were directing. [*Id.* ¶ 25.] Parts of both projects had been on hold while waiting for Ibrahim to start because each required his expertise in advanced quantitative research and design analysis. [*Id.*] Century also tasked Ibrahim with writing portions of a proposal. [*Id.* ¶¶ 26, 27.] According to the University, Ibrahim did not follow Century's instructions or complete the portions he was assigned which caused a great deal of last-minute work, whereas according to Ibrahim, Century started the proposal late and he successfully contributed to it. [Def.'s SOF ¶¶ 29-33; Pl.'s Resp. SOF ¶¶ 29-33.] Regardless, it is undisputed that on the last day before the deadline, Century and Blackwell

completed sections of the proposal that had previously been assigned to Ibrahim. [Pl.'s Resp. SOF ¶ 33.] The proposal was timely submitted on August 10, 2016, but it was not funded. [*Id.* ¶ 34.]

Wille experienced problems working with Ibrahim that she attributed to his failure to follow instructions. [Def.'s SOF ¶ 35.] For example, on or about August 10, 2016, Ibrahim was to take the lead role in preparing a paper to be submitted for peer review at a conference. [Pl.'s Resp. SOF ¶ 36.] This entailed performing the analysis, preparing an outline, preparing a timeline for drafts of the paper, and taking the lead on writing it. [*Id.*] On or about August 16, 2016, Ibrahim sent Wille an outline which did not meet her expectations. [*Id.* ¶ 37.] On or about August 18, 2016, Ibrahim circulated a draft of the paper that did not indicate which sections of the paper he would draft or which areas needed more information. [*Id.* ¶ 39.] Although Ibrahim declares that as first author he took responsibility for the paper's development, he does not dispute that entire sections of the paper were untouched as the deadline approached, and Wille tasked two junior colleagues with writing the portions that he had not. [*Id.* ¶ 37.] According to the University, Wille took over lead responsibility for the paper by August 23, 2016, because she no longer believed he could finish it on his own. [Def.'s SOF ¶ 41.] Ibrahim disputes this, and says he allowed Wille to contribute to the paper because she was the overall project leader, and he valued her opinion. [Pl.'s Resp. SOF ¶ 41.] Although the parties dispute the reason, it is undisputed that on August 25, 2016, Wille instructed Ibrahim to make revisions to the paper, he did not make them, and Wille then re-edited the paper. [*Id.* ¶ 42.] Wille believed Ibrahim's performance on the paper caused it to be unnecessarily rushed and made more work than expected, leading to its rejection and a missed opportunity for Outlier. [Def.'s SOF ¶ 43.] Since the paper was approved by each listed author before submission, however, Ibrahim disputes he is to blame for any failure. [Pl.'s Resp. SOF ¶ 43.]

5

During an August 30, 2016, meeting to discuss Outlier staffing, Century, LaForce, and Wille discovered that they shared similar concerns about Ibrahim's performance, including what they perceived to be his slow pace, inability to take direction, poor communication skills, and questionable quality of work. [*Id.* ¶ 45.] Century reached out to Fohran for advice about how to proceed, and based on her advice, directed Wille and LaForce to continue working with Ibrahim and assisting him as they normally would, but to closely monitor his work and document any concerns. [*Id.*]

About two weeks later, on September 14, 2016, Century met with Wille and LaForce to discuss Ibrahim's performance since their last meeting. [*Id.* ¶ 46.] They agreed it had not improved, and that Ibrahim did not seem to appreciate either the issues or the impact it had on Outlier. [*Id.*] That same day, Century invited Ibrahim to a meeting on September 19, 2016 that would include Wille, LaForce, Cassata, and Fohran. [*Id.* ¶ 47.] During the September 19 meeting, Century, Wille, and LaForce expressed their concern that Ibrahim did not appear to take direction well or communicate well. [*Id.*] Century also expressed her concerns about the quality of his work, explained that she was losing confidence in his ability, and that he would need to rebuild that confidence if he expected to continue in his position. [*Id.*] Although the parties dispute its import, it is undisputed that LaForce told Ibrahim during the meeting, "We are the bosses here." [Def.'s Resp. Pl.'s Add'l SOF ¶ 11.] Ibrahim testified that he was taken aback by the meeting because "this is like, really, like discrimination based on status, based on me being here as a male with a group of females trying to dominate." [Pl.'s Resp. SOF ¶ 48.] Nevertheless, Ibrahim emailed Century that evening thanking her for the feedback, and promising to learn from it. [Def.'s Resp. Pl.'s Add'l SOF ¶ 12.]

The situation did not get better, however, because the next day, Ibrahim submitted what LaForce believed was a data analysis with a known but undisclosed error. [Pl.'s Resp. SOF ¶ 49.] LaForce noticed the error and asked him about it. [*Id.*] Ibrahim responded that he too had been surprised by the numbers and had done the calculation twice, "but went through the same formula and my eyes didn't catch that I didn't include one variable." [*Id.*] LaForce understood this response to mean that Ibrahim knew about the error but had failed to correct it or point it out. [Def.'s SOF ¶ 49.] Ibrahim disputes this characterization, and insists he did not know about the error when he submitted his work. [Pl.'s Resp. SOF ¶ 49.]

At Ibrahim's request, Century met with him again on September 21, 2016. [*Id.* ¶ 50.] Ibrahim was surprised that Century included Fohran in the meeting, which Century says she did given the nature of the conversations she had been having with him and the severity of the potential discipline ahead. [*Id.*; Def.'s Resp. Pl.'s Add'l SOF ¶ 14.] The parties dispute certain aspects of what transpired during the meeting, but it is undisputed that Century advised Ibrahim that she remained concerned about his performance, and troubled that he had turned in a report as complete even though he knew there was a problem with the data. [Pl.'s Resp. SOF ¶ 50.] The parties also agree that during the meeting, Century denied Ibrahim's request for approval to take a statistics course despite that it was on the weekends and professional development was a mandate for high performance by the University. [*Id.*; Def.'s Resp. Pl.'s Add'l SOF ¶ 15.]

The next day, Ibrahim pointed out a conceptual error in a data set to Century, and requested guidance on how to handle it. [Def.'s Resp. Pl.'s Add'l SOF ¶ 18, Pl.'s Ex. V.] Century responded that she had no suggestions and that managing quantitative data was his area of expertise, not hers. [*Id.*] Ibrahim took her response to be extremely hostile. [Pl.'s Resp. Pl.'s Add'l SOF ¶ 18.]

On September 26, 2016, Ibrahim was terminated from the University for failure to meet performance expectations. [Pl.'s Resp. SOF ¶ 51.] According to Century, she had never had an employee fail to meet performance expectations of the same severity and consequence as Ibrahim. [Def.'s SOF ¶ 62.] Ibrahim subsequently reached out to the University's Human Resources Department to intervene on his behalf, but he did not report a claim of discrimination. [Pl.'s Resp. SOF ¶ 55.]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Zaya*, 836 F.3d at 804 (citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255.

Northern District of Illinois Local Rule 56.1 governs how the parties identify material facts and potential disputed material facts. "The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the proffered fact." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Local Rule 56.1 statements and responses should identify the relevant admissible evidence supporting asserted material facts, not make factual or legal

arguments. *See Zimmerman v. Doran,* 807 F.3d 178, 180 (7th Cir. 2015). The Court is not required to "wade through improper denials and legal arguments in search of a genuinely disputed fact." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000); *accord Curtis*, 807 F.2d at 219. "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Curtis*, 807 F.3d at 218 (internal quotation omitted). The Seventh Circuit "has consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015).

## DISCUSSION

Ibrahim complains in this action that the University discriminated against him based on his religion, national origin, and sex by subjecting him to unequal terms and conditions of employment (Counts I-III) and by terminating him (Counts IV-VI). [Compl.] The University moves for summary judgment, arguing that the claims fail for lack of evidence that Ibrahim was meeting the University's legitimate expectations or that similarly situated employees outside of his protected class were treated more favorably. [Dkt 63, Def.'s Mem. at 10-11.] In addition, the University argues, Ibrahim's terms and conditions claims fail as a matter of law because the complained of actions are not materially adverse, his sex discrimination claims fail because he cannot make the applicable heightened showing, and his religious discrimination claims fail because there is no evidence that Century knew his religion when she decided to terminate him. [*Id.* at 11-15.]

Ibrahim opposes the motion, arguing at the threshold that it should be stricken on the basis that the University's asserted facts are improperly lengthy and argumentative. [Dkt 67, Pl.'s Resp. at 3-4.] According to Ibrahim, evidence in the record demonstrates that the University's stated

reason for his termination is false and exaggerated and that the University treated similarly situated individuals outside of his protected classes more favorably. [*Id*. at 4-13.]

The University disputes these arguments in reply, and says that it is Ibrahim whose Local Rule statement fails to comply with the rules. [Dkt 68, Def.'s Reply at 7-9.] According to the University, not only is summary judgment appropriate on the merits, but it also is warranted based on Ibrahim's failure to properly controvert asserted facts with citation to the record and his failure to respond to several of the University's arguments. [Def.'s Reply at 7-14.]

## I. The Parties' Local Rule 56. 1 Statements

The Court begins with the parties' procedural arguments. Notwithstanding Ibrahim's objections, the Court finds no reason to strike the University's motion. In compliance with Local Rule 56.1, the University's Local Rule statement sets out the facts it says are undisputed, and supports those assertions with citations to the record. [Def.'s SOF.] Its asserted facts are not buried in argument, nor is the repetition of its asserted facts in its legal memorandum a basis to strike the motion. Further, Ibrahim does not argue and it does not appear that the length of the paragraphs within the University's submission confused him or otherwise impaired his ability to respond. [*See* Pl.'s Resp. at 3-4.] Notably, the University's submission is well under the 80-paragraph maximum set out in Local Rule 56.1(a), and requiring the University to break out certain paragraphs simply to make them less lengthy would elevate form over substance.

On the other hand, Ibrahim's responsive Local Rule statement fails in significant measure to comport with the Local Rules. Specifically, it contains extensive and improper argument and characterization of evidence [*e.g.*, Pl.'s Resp. SOF ¶¶ 7, 10, 12, 18-20], numerous assertions that are unsupported by any citation to the record [*e.g.*, *id.* ¶¶ 4, 5, 45, 46, 50], several responsive objections that neither concede nor dispute the assertion and/or are not well-founded [*e.g.*, *id.* ¶¶

10

15, 30, 48, 51], and several misquotes of the record [*e.g., id.* ¶¶ 18, 19]. None is proper under Local Rule 56.1. The Seventh Circuit has "repeatedly held that a district court is entitled to expect strict compliance with Rule 56.1." *Ammons v. Aramark Uniform. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004); *accord Flint*, 791 F.3d at 767. This Court does so. Accordingly, to the extent Ibrahim fails to respond to the University's well-supported assertions of fact with a dispute supported by citation to the record, the fact is deemed admitted.

## II. Ibrahim's Employment Discrimination Claims[2]

Title VII prohibits an employer from discriminating against an employee on the basis of certain protected characteristics including sex, religion, and national origin. 42 U.S.C. § 2000e-2(a). On summary judgment, the question before the Court is whether the evidence would permit a reasonable factfinder to conclude that a protected characteristic of the plaintiff caused the adverse employment action about which he complains. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *accord Barnes v. Bd. of Trustees of the U. of Ill.*, No. 19-1781, 2020 WL 37682, at *3 (7th Cir. Jan. 3, 2020). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself[.]" *Id.*

The holistic approach set out by the Seventh Circuit in *Ortiz* supplements but does not replace the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719-20 (7th Cir. 2018) ("However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence to decide whether a reasonable jury could find that the plaintiff suffered an

---

[2] Because Ibrahim failed to respond to the University's argument that his terms and conditions claims fail as a matter of law, he has abandoned those claims (Counts I-III). *See Palmer v. Marion Cty.*, 327 F.3d 588, 597-98 (7th Cir. 2003) (claim is abandoned when not delineated in opposition to summary judgment).

adverse action *because of* [her protected characteristic].")." "*McDonnell Douglas* is a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases," but it "is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Here, Ibrahim proceeds under the *McDonnell Douglas* burden-shifting framework. [Pl.'s Resp. at 2.] The Court analyzes his claims accordingly. *See Barnes*, 2020 WL 37682 at * 3.

"Generally speaking, under *McDonnell Douglas*, the plaintiff has the initial burden of establishing that (1) she is a member of a protected class, (2) she performed reasonably on the job in accord with her employer's legitimate expectations, (3) despite her reasonable performance, she was subjected to an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably by the employer." *David*, 846 F.3d at 225 (internal quotation omitted). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id.* (internal quotations omitted).

According to the University, Ibrahim cannot prevail on his claims because there is no evidence in the record from which a reasonable factfinder could conclude that he was meeting the University's legitimate expectations when it terminated him. [Def.'s Mem. at 8, 10; Def.'s Reply at 2.] Ibrahim argues in opposition that because he was an exemplary employee who exceeded the University's expectations, its purported reasons for his termination are false. [Pl.'s Resp. at 4-6.] According to Ibrahim, there were no different evaluation criteria for probationary and non-probationary employees, and because other employees with performance deficiencies were not

terminated, the University's assessment of the severity of his alleged deficiencies is so exaggerated that it evidences pretext. [*Id*. at 4-7.] These arguments, however, cannot support his claims.

First, it is undisputed that Century made the decision to terminate Ibrahim based on her belief that he was not meeting the University's expectations. [Pl.'s Resp. SOF ¶¶ 45, 46, 51.] [3] Although Ibrahim vigorously disputes Century's assessment, the only evidence he points to is his own subjective belief. [Pl.'s Resp. at 6; Pl.'s Resp. SOF ¶¶ 23, 35, 36, 41, 43, 44, 51.] A plaintiff's own opinion about his work performance, however, is irrelevant. *Sklyarsky v. Means-Knaus Partners, L.P.*, 777 F.3d 892, 897 (7th Cir. 2015) (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) and *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)).

Similarly, Ibrahim fails to create an issue of fact as to whether he was treated less favorably than workers outside of his protected class. "To determine whether employees are similarly situated, courts ask whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019). In this case it is undisputed that Century observes probationary employees closely to determine their fit, and that unlike the employees he proposes as comparators, Ibrahim was a probationary employee at the time of his termination. [Pl's Resp. SOF ¶¶ 12, 13, 17, 18, 51.] This distinction alone is sufficient to find that Ibrahim was not similarly situated to his proposed comparators. *Steinhauer v. DeGolier*, 359 F.3d 481, 484 (7th Cir. 2004) (finding two employees

---

[3] Ibrahim objected to many of the University's asserted facts reciting Century, LaForce and Wille's assessment of his performance as improper conclusions or opinions. [*E.g.,* Pl.'s Resp. SOF ¶¶ 23, 35, 45, 47.] This is not a proper objection; a witness may provide testimony about facts within the witness's knowledge or based on the witness's perception. FED. R. EVID. 602, 701.

"were not similarly situated because [plaintiff] was on probation while [the proposed comparator] was not."). Ibrahim attempts to avoid this conclusion by arguing that the distinction was illusory at Outlier since LaForce and Century could not articulate the difference in evaluation criteria during their depositions. [Pl.'s Resp. at 6.] A review of the cited transcripts however does not support his assertion, both because Century was not asked to explain the distinction and because LaForce testified that there might be different evaluation criteria, she just did not know them. [Pl.'s Add'l SOF 4-5; Pl.'s Ex. B, LaForce Dep. 64:01-07, 65:01-24, 66:01-6, 67:13-68:06; Pl.'s Ex. D, Century Dep. 72:03-18.]

Moreover, even if the probationary distinction were illusory as Ibrahim argues, Ibrahim fails to point to any evidence to suggest that his proposed comparators are similarly situated. In making this determination, the critical question is not whether the employees have engaged in identical conduct, but rather whether the conduct is of comparable seriousness. *Peirick v. Indiana U.-Purdue U. Indianapolis Athletics Dep't*, 510 F.3d 681, 689 (7th Cir. 2007); *de Lima Silva*, 917 F.3d at 559. In other words, "[T]o show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a comparable set of failings." *Taylor-Novotny v. Health All. Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (internal quotation omitted).

In this case, the University believed Ibrahim did not communicate effectively with colleagues, had difficulties with time management and prioritization, did not follow directions, and delivered work that was insufficient or reflected poor judgment despite feedback. [Pl.'s Resp. SOF ¶¶ 45, 46, 51.] It believed he had turned in work he knew was inadequate without identifying the flaw to anyone. [*Id.* ¶¶ 49, 50.] None of the evidence Ibrahim cites arguably demonstrates comparable infractions. [*See* Pl.'s Resp. at 8-11.] Instead, Ibrahim points to testimony that: (1)

14

King was only an "okay employee" whose work-pace benefitted from more frequent status checks from project supervisors; (2) Huifang Zuo and Katie Ferris performed an analysis that needed to be "rework[ed]" (although that was "relatively expected" for a first try); (3) Ferris spoke dismissively to a colleague; (4) Talbot's ability to positively spin evaluation findings improved less after feedback than Century would have liked; (5) Loo was encouraged to speak up more in meetings; and (6) Noble was encouraged to speak with more confidence to clients. [*Id.* at 6-11.] While this evidence suggests each of the purported comparators have room for improvement, it is not evidence that any Outlier staff demonstrated as many or as severe issues with their performance as plaintiff.

For these same reasons, Ibrahim's argument that the University's application of its legitimate expectations was itself discriminatory fails to save his claims. The Seventh Circuit has held that "where the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it makes little sense to discuss whether she was meeting her employer's reasonable expectations." *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001) (internal quotation omitted). Stated more generally, "[w]hen a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably." *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 492 (7th Cir. 2014) (quoting *Grayson v. O'Neill*, 308 F.3d 808, 818 (7th Cir. 2002)). In this case, however, Ibrahim points to no evidence from which a reasonable factfinder could find that the University applied its expectations in a disparate way. "Simply being a member of a protected class, without something more to link that

15

status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Bd. of Tr. of Northern Ill. U.*, 838 F.3d 888, 900 (7th Cir. 2016).

Similarly, Ibrahim's argument that Century's incorrect assessment of his skills itself evidences discrimination does not demonstrate an issue for trial. [*See* Pl.'s Resp. at 4.] It is well-settled that a plaintiff cannot establish pretext merely by showing that an employer's assessment is incorrect. *Barnes*, 2020 WL 37682 at *3. Ibrahim's arguments notwithstanding, "[t]he question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reasons it has offered to explain the discharge." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 708 (7th Cir. 2013) (internal quotation omitted); *accord Grant v. Trs. of Indiana U.*, 870 F.3d 562, 570 (7th Cir. 2017). "It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Id.* (internal quotation omitted). Although he plainly disagrees with the decision, Ibrahim points to no evidence to suggest the University did not believe the proffered reasons for his termination. [Pl.'s Resp. at 4-12.]

Considering the evidence as a whole, because Ibrahim fails to present sufficient evidence from which a reasonable factfinder could conclude that the University discriminated against him based on his sex, religion or national origin, the Court need not consider the University's remaining arguments, and its motion for summary judgment is granted.

## CONCLUSION

For the reasons discussed above, Defendant's motion for summary judgment [dkt 62] is granted. Civil case terminated.

Date: 1/24/2020

Jorge L. Alonso
United States District Judge